# EXHIBIT 1

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

JAN 2 3 2024

RICK WARREN
COURT CLERK
41

| | |
|---|---|
| (1)  JANE DOE 2 | |
| *Plaintiff,* | |
| v. | Case No. CJ - 2024 - 437 |
| (1)  LIBERTY OF OKLAHOMA CORPORATION; | |
| (2)  LIBERTY HEALTHCARE CORPORATION; | **JURY TRIAL DEMANDED** |
| (3)  AKIL GAY; | ATTORNEYS' LIEN CLAIMED |
| (4)  STACIE CAYWOOD; | |
| (5)  HUGH SAGE; | |
| (6)  AERIN MERRICK; | |
| (7)  KENA BRUNO; | |
| (8)  TAYLER HOWARD; and | |
| (9)  JENNIFER BICKNELL, | |
| *Defendants.* | |

**PLAINTIFF'S ORIGINAL PETITION**

1

Jane Doe 2 ("Plaintiff"), hereby files this Original Petition against Defendants Liberty of Oklahoma Corporation ("LOC"), Liberty Healthcare Corporation ("LHC") (LOC and LHC are collectively referred to as "Liberty" or the "Liberty Defendants"), Akil Gay, Stacie Caywood, Hugh Sage, Aerin Merrick, Kena Bruno, Tayler Howard, and Jennifer Bicknell, (Defendants Gay, Caywood, and Sage are collectively referred to as the "Greer Center Administrators") (Defendants Aerin Merrick, Kena Bruno, Tayler Howard, and Jennifer Bicknell are collectively referred to as the "Individual Defendants") (all Defendants are collectively referred to as the "Defendants").

## I.   INTRODUCTION

1.      The Robert M. Greer Center ("Greer Center") is a full-time treatment facility in Enid, Oklahoma, for adults diagnosed with intellectual disabilities and co-occurring mental illness and/or severe behavioral challenges. The facility houses some of our most vulnerable citizens. Many of the Greer Center residents are either non-verbal and/or severely intellectually and developmentally delayed. The Greer Center is supposed to be a place of healing, comfort, peace, and stability. Instead, for the last several years, it has served as hell-on-earth for many of its residents.

2.      Since November 2023, at least eight (8) employees of Liberty Healthcare have been arrested and/or charged related to the physical abuse of residents of the Robert M. Greer Center. Many others have now been suspended or resigned. These charges include physical abuse by caretaker, conspiracy, resisting arrest, and obstruction. The allegations of abuse are horrific. The efforts by Liberty Healthcare employees, including management, to hide the abuse and retaliate against those that reported it are unconscionable.

3.      The abuse included physical assaults, forms of waterboarding, choking residents until they were unconscious and then beating them until they regained consciousness, kicking them

2

in the face, enticing residents—persons with intellectual disabilities—to abuse each other, hanging residents by their clothes from coat racks, knowingly providing them with access to dangerous and deadly resources such as razor blades and bleach (to drink), and letting them soak in their own urine.

4.      Plaintiff worked at the Greer Center from July 2022 until July 2023. During her tenure, she repeatedly reported caretaker abuse and neglect to her superiors.  Further, she reported the mistreatment, retaliation, and harassment she endured from other Liberty employees for reporting their misconduct. She reported Defendants' conduct on a weekly, if not daily, basis.

5.      Plaintiff reported other staff yelling at her, cursing at her, shoving her, and working together to bully her. Plaintiff even reported staff taking out their frustration with Plaintiff on residents by abusing or neglecting the specific residents for whom Plaintiff provided care.

6.      But instead of taking action, or doing anything to address the horrific abuse and neglect, Plaintiff's managers responded to Plaintiff with things like:

     a.   "You are at fault for this;"

     b.   "You should ignore it;"

     c.   "You need to take some responsibility of why someone would want to treat you this way;"

     d.   "You have to learn how to control your emotions;" and

     e.   "As grown adults, if you guys can't work this shit out, then I don't know what to do."

7.      Just a few months after she started working at the Greer Center, Plaintiff had to take leave to go see a doctor. Plaintiff began suffering from anxiety and depression resulting in hives all over her body. Plaintiff was prescribed medications for her anxiety so that she could return to work.

8.     Plaintiff eventually returned to work, but Defendants' conduct only worsened. Plaintiff continued to report abuse, neglect, and retaliation at the Greer Center.

9.     In June 2023, Plaintiff was contacted by law enforcement alerting her to the fact that there were flyers hung around Enid, Oklahoma with her picture and phone number, advertising her for sex work.

10.    Plaintiff began receiving calls late at night while at home with her family asking her for sex work.

11.    Plaintiff reported the flyers and the late-night calls to her managers at Liberty, including her direct supervisor Akil Gay, and the head of Human Resources Stacie Caywood. However, they both ignored her and told her, "this is not a Liberty issue." Moreover, Akil Gay told Plaintiff, "You need to take some responsibility of why someone would want to treat you this way." Mr. Gay further told Plaintiff that Liberty would not investigate it and that if she wanted anything done, she would have to investigate it herself. Mr. Gay told Plaintiff that she would be required to take PTO to investigate it herself since "it is not work related." So she did.

12.    Plaintiff drove around town by herself, collecting flyers and security camera footage and, along with law enforcement, eventually identified four Liberty co-workers as the culprits that hung the flyers: Defendants Aerin Merrick, Jennifer Bicknell, Kena Bruno, and Tayler Howard. All four admitted to law enforcement their involvement in creating and distributing the flyers.

13.    On or about June 7, Plaintiff met with her manager Akil Gay. Plaintiff was weeping in her manager's office, begging him to help. Mr. Gay told Plaintiff he knows that how she is treated by other employees is wrong, but that the flyers were "her fault." Mr. Gay further berated Plaintiff, blaming her for "not taking any responsibility for your part in this." Mr. Gay asked

Plaintiff, "Have you ever questioned yourself, why are they just like that to me?" He then blamed Plaintiff again, saying "It's your approach." This interaction caused Plaintiff to have a panic attack and to seek immediate medical attention and resulted in Plaintiff being placed on medical leave.

14.     On or about June 16, Liberty told Plaintiff that the staff involved in the flyers would not be fired. And rather than remove the culprits from the premises altogether, Liberty asked Plaintiff to move to another building at the Greer Center. Plaintiff declined.

15.     Plaintiff was forced to seek protection on her own. In July 2023, Plaintiff was granted Protective Orders against the co-workers involved in creating and distributing the flyers. The Orders were entered by Judge Jeff Crites in Garfield County.

16.     However, as a result of law enforcement's investigation into the retaliation against Plaintiff, Plaintiff was told she was not safe living in Enid, Oklahoma and that it was in her best interest to move.

17.     In late July 2023, Plaintiff relocated.

18.     As described herein, the Liberty Defendants and Greer Center Administrators failed to protect Plaintiff and instead subjected her to constant abuse, harassment, retaliation, ridicule, and embarrassment. The Liberty Defendants and Greer Center Administrators repeatedly ignored reports of abuse, neglect, harassment, and retaliation against Plaintiff. This caused Plaintiff severe anxiety and depression, rendering her unable to work on multiple occasions.

## II.    **PARTIES**

19.     Plaintiff Jane Doe 2 is an individual and former employee of the Liberty Defendants. Jane Doe 2 resides in Edmond, Oklahoma in Oklahoma County.

20.     Defendant Liberty of Oklahoma Corporation is a privately-owned healthcare management and staffing company contracted to operate and oversee the direct care of residents

admitted at the Greer Center Facility in Enid, Oklahoma. LOC is a domestic, for-profit corporation. LOC's registered agent, C T Corporation System, can be served with process at: 1833 South Morgan Road, Oklahoma City, OK 73128. Defendant Liberty of Oklahoma Corporation is an affiliate of Defendant Liberty Healthcare Corporation.

21.     Defendant Liberty Healthcare Corporation is a privately-owned health and human services management company that operates treatment programs, and provides health workforce outsourcing throughout the United States, including Oklahoma. LHC is a foreign, for-profit corporation from Pennsylvania. LHC's registered agent, C T Corporation System, can be served with process at: 1833 South Morgan Road, Oklahoma City, OK 73128.

22.     Defendant Akil Gay is a manager at LOC. Defendant Gay can be served with process at 2902 W Cherokee Ave, Enid, Ok 73703.

23.     Defendant Stacie Caywood is an individual and a Human Resources administrator at LOC. Defendant Caywood can be served with process at 1874 Highway 58, Ringwood, Oklahoma 73768.

24.     Defendant Hugh Sage is an individual, the CEO of LOC, and an Executive Director of LHC. Defendant Sage is also the official "Administrator" in charge of the Greer Center Facility for purposes of the Oklahoma Nursing Home Care Act. *See* 63 O.S. § 1-1902(3). Defendant Sage can be served with process at 3017 Claremont, Enid, Oklahoma 73703.

25.     Defendant Aerin Merrick is an individual, and was an employee of Liberty of Oklahoma. Defendant Merrick can be served with process at 701 Mistletoe, Enid, Ok 73701.

26.     Defendant Kena Bruno is an individual, and was an employee of Liberty of Oklahoma. Defendant Bruno can be served with process at 217 E Olive St, Enid, Ok 73701.

27.     Defendant Tayler Howard is an individual, and was an employee of Liberty of Oklahoma. Defendant Howard can be served with process at 409 N 11th St, Enid, Ok 73701.

28.     Defendant Jennifer Bicknell is an individual, and was an employee of Liberty of Oklahoma. Defendant Bicknell can be served with process at 1302 Gannon Ave, Enid, Ok 73703.

### III.   JURISDICTION AND VENUE

29.     This Court may properly exercise jurisdiction over the subject matter of this suit under Article VII, Section 7, of the Oklahoma Constitution.

30.     This Court has personal jurisdiction over the Defendants, as they are all domiciled in the state of Oklahoma, created pursuant to the laws of Oklahoma, and/or conduct business in and throughout Oklahoma and have deliberately engaged in significant acts and omissions within Oklahoma that have injured citizens of Oklahoma. Defendants also have sufficient minimum contacts with the State of Oklahoma. Defendants have purposefully availed themselves of the privilege of conducting business in Oklahoma such that they are subject to suit here. Additionally, Defendants have targeted their wrongful conduct at Oklahoma. Plaintiff's claims arise out of and relate to Defendants' contacts with the State. This Court's exercise of jurisdiction is reasonable; the maintenance of this suit does not offend traditional notions of fair play and substantial justice.

31.     Venue is proper in this Court under 12 O.S. §§ 134, 137, and 139; and 18 O.S. § 471.

### IV.   PROCEDURAL HISTORY & RESERVATION OF RIGHTS

32.     The Oklahoma Governmental Tort Claims Act (OGTCA) does not apply to any claims asserted herein. However, out of an abundance of caution, Plaintiff will send notice of these claims to LOC and LHC pursuant to the pre-suit notice provisions of the OGTCA. 51 O.S. §§ 156, 157.

33.     For the sake of clarity, and in the event that Defendants seek to remove this case and/or claims that any federal question is raised by this Petition or any other paper, or seek to dismiss this case as currently plead and/or claims that Plaintiff failed to exhaust her administrative remedies, Plaintiff expressly states that she is not, through this Petition, asserting any federal claims or questions related to discrimination,  including retaliation related to discrimination, on the basis of race, color, religion, sex (including pregnancy, sexual orientation, and gender identity), or national origin. This specifically includes any claims that could be brought pursuant to Title VII of the Civil Rights Act of 1964 or 25 Okla. Stat. § 135. Plaintiff reserves her right to amend this Petition accordingly.

## V.     **FACTUAL BACKGROUND**

34.     Plaintiff started working at the Robert M. Greer Center in July 2022. She was employed by Liberty of Oklahoma Corporation and/or Liberty Healthcare.

35.     Plaintiff worked as a Human Services Treatment Specialist, also known as an HSTS1. Her responsibilities as an HSTS 1 included writing development programs for the clients, collecting data on programs, in-servicing programs to staff, and completing integrity checks on staff. She also handled clients' finances, planned trips for clients and taught sexual awareness classes.

36.     There is also a position at Greer called HSTS2. HSTS2's are charged with investigating Client Injury Reports (CIR), discussed further below.

37.     Plaintiff was not responsible for the day-to-day direct care of the residents, *i.e.*, showering, dressing, taking to meals, etc. Direct care belonged to the Habilitation Specialist or "HS" as it is referred to by Liberty staff. There are 3 levels of HS. For the first 6 months, the caretakers are categorized as HS1. After about 6 months, they are promoted to HS2. The majority

of caretakers are HS2. The building supervisor is known as an HS3. The HS3 is in charge of supervising staff and the clients on their building.

38.     There are three main buildings at the Greer Center where residents live—East, West, and Central. Each building has approximately 16 rooms with 1 room per resident. There is also a separate house on campus with additional beds. Residents are typically assigned to a building based on their level of cognitive ability, independence, and general care requirements. For example, many of the non-verbal residents generally live in the East building, while the more independent residents live in the Center building.

39.     Each building has its own unit manager and dedicated staff. This means that most staff are assigned to work on one building at all times. Occasionally, staff may have to assist on other buildings, or even get transferred permanently to another building, but generally staff are assigned to work a single building.

40.     Similarly, staff are often dedicated to serving certain residents. For example, Plaintiff was assigned to create development programs for certain residents.

41.     This is important because many residents have very specific needs and behaviors that are better addressed by staff familiar to them. For example, certain residents have a history of self-injurious behavior (SIB) and cannot have access to things they can harm themselves with. Other residents have very particular behavioral triggers that only familiar staff would know to avoid. Some of the more impaired residents require what is called one-on-one care, which means a staff member, typically an HS, is required to be with the resident at all times, even in their room. Having staff familiar with the residents' specific needs is intended to prevent unnecessary harm and stress on the residents as well as to give them a sense of trust, comfort, and familiarity.

42.     When a resident is injured, staff are required to complete a Client Injury Report (CIR). Generally, if staff sees a mark, bruise, cut, etc. on a resident, they fill out a CIR describing the injury, how it happened if known, people involved, and the client behavior following the incident, along with the date and time of the report. Medical Staff, typically the wing nurse, then follows up, evaluates the injury, describes any treatment given, and signs off on the CIR. If necessary, CIRs are to be investigated by HSTS2s and management. Liberty has an obligation to report certain injuries, including abuse and neglect, to state agencies, including DHS.

43.     Often, in Plaintiff's experience, staff were untruthful when filling out CIRs. Staff would lie about how an injury happened to cover up abuse, particularly when the abuse left an unexplained physical mark. For example, staff would report in a CIR that a resident fell or got in a fight with another resident to explain how a client was left with visible injuries. Moreover, CIRs were not sufficiently investigated even when there was cause to believe the injury was the result of caretaker abuse. This is because, in some circumstances, the staff often operated as a "clique" that helped protect each other. For example, an HS3 would help HS2s cover up abuse and neglect by telling them what to write in their CIRs and then vouching for the accuracy of the CIR.

44.     Staff would also lie about providing the required level of care to residents. For example, HS staff were required to document that staff and/or residents completed certain tasks daily, specifically tasks that were set forth as part of the development programs created by Plaintiff and other HSTS1 staff. These includes things like programs to teach residents how to brush their teeth on their own, get dressed, feed themselves, use the bathroom, as well as programs related to managing finances and/or their medicine. Over time, if followed, these programs teach clients independence so that they may one day be able to live a more independent lifestyle outside of the Greer facility.

45.     Plaintiff regularly completed Integrity Checks to evaluate if staff were running her programs correctly. Plaintiff witnessed staff complete false reports saying that the tasks were completed when they were not.

46.     For example, Plaintiff witnessed staff sign off that programs were completed on days when the residents were not even present in the facility. Other times, staff admitted that although they reported that the resident had completed the tasks personally, the staff completed the tasks themselves because it was just easier. Plaintiff reported the false documentation.

47.     Plaintiff witnessed—and reported— abuse and neglect almost daily. And Plaintiff regularly reported the retaliation and harassment she endured as a result of reporting abuse and neglect. Included below are examples of abuse, neglect, retaliation, and harassment that Plaintiff witnessed and suffered. The fact that this is not an exhaustive list is both troubling and horrifying.

**Examples of Resident Abuse and Neglect That Plaintiff Reported**

48.     In February 2023, Plaintiff reported that Jonathan Martinez told a resident, to "get her ugly ass up and go to her room." There were several witnesses to this incident. Plaintiff turned in a statement to Liberty management regarding this abuse. Plaintiff included in her report how she was being treated by a group of staff.

49.     In February 2023, Plaintiff took a non-verbal resident to eat lunch in the dining room. Plaintiff observed the resident to be limping. Plaintiff took the resident's sock off and noticed her ankle was swollen and bruised. Caretaker staff (HS) responded to Plaintiff that they didn't know what happened to the resident. Plaintiff checked, but there was no CIR related to the resident's injury. Plaintiff reported the injury to the building nurse and the resident was taken to the hospital where it was determined that the resident's ankle was fractured. It is unknown how long the resident was walking around on a broken ankle or why there was no CIR completed.

50.     Days later, Kerrie Burgess, an HS3 (caretaker and building supervisor) confronted Plaintiff in her office. She told Plaintiff that no one liked her because she oversteps her boundaries, asks too many questions, and reports abuse and neglect. Plaintiff reported this retaliation to her manager, Akil Gay. Mr. Gay responded that some people are just dumb.

51.     In March 2023, staff member Arianna Shannon provided a resident with staff keys to her hygiene cabinet. The resident was not allowed to access her hygiene box without supervision due to her history of self-injurious behavior (SIB). The resident was not allowed to shave without supervision for the same reason. Moreover, residents are not allowed to have staff keys. The resident then proceeded to cut herself with a razor. Plaintiff reported this incident to her manager, Akil Gay. Mr. Gay stated that the resident shouldn't have cut herself. To Plaintiff's knowledge, no staff was disciplined.

52.     Another time, Aerin Merrick, an HS in the East building, provided a bottle of bleach to a resident. This is strictly prohibited. The resident proceeded to drink the bleach and had to be rushed to the emergency room. When Plaintiff heard about this incident she reported it to her manager Akil Gay. Plaintiff asked why Ms. Merrick was still working with residents. Mr. Gay responded that she was new and that he was going to let her stay on.

53.     In March 2023, Plaintiff reported to her manager that she was being bullied and harassed by a co-worker named Barbara, an HS2. Mr. Gay scheduled a meeting with Plaintiff, Barbara, and another co-worker named Debbie "D.C." Costello. Plaintiff reiterated that Barbara was bullying her at work.

54.     Just a few days later, Plaintiff broke out in hives from her anxiety and depression due to the way she was being treated at work by her co-workers and managers. Plaintiff called in sick to work and went to the doctor.

55.     In April 2023, Plaintiff told her manager Akil Gay that she was going to report to Adult Protective Services (APS) that a Liberty staff caretaker, Jonathan Martinez (FN), punched and slapped a resident, an intellectually disabled non-verbal female resident in the face. Plaintiff let her manager know that there were several witnesses to the assault. Nevertheless, Plaintiff's manager, Mr. Gay, told her not to call APS. Instead, he told her to report it to the building manager, Brett Hemstreet. Plaintiff made a report to APS anyway.

56.     The blows to her face left this resident with, at a minimum, a black eye.

57.     Plaintiff and a resident that witnessed the incident completed written statements and turned them into Liberty management.

58.     Brett Hemstreet told Plaintiff that he knew that abuse had been happening a long time in the East building, which is typically reserved for non-verbal residents. However, Mr. Hemstreet indicated that reports of abuse had increased due to the simple fact that now that more residents living in East were verbal.

59.     A short time after Plaintiff made the report, she was retaliated against. Amy Sutton, a med aide in the East building, called her a snitch for reporting that Jonathan Martinez hitting a resident. Plaintiff reportedd this incident into her manager, Akil Gay. To Plaintiff's knowledge, Ms. Sutton was not disciplined.

60.     Due to the report involving Jonathan Martinez abusing a resident, as well as Brett Hemstreet's comments, Plaintiff asked management to reopen an investigation into the abuse of another primarily non-verbal resident living in the East building. Plaintiff had long been concerned that caretaker abuse of this resident had been covered up.

61.     In early April 2023, this resident suffered a gash to his left eye, causing his eye to swell completely shut.

62.     The Client Injury Report (CIR) concerning this incident stated that the resident fell in the shower. Notably, the CIR was completed by Jonathan Martinez. There was no investigation into caretaker abuse.

63.     There was another CIR from March 2023 related to the same resident where it was reported that the resident had a bruise on his face.

64.     In May 2023, Plaintiff asked her managers to re-open the investigation into this specific incident. Specifically, Plaintiff explained to her manager that the marks on this resident's face did not match any pattern in the resident's shower. Instead, she pointed out that the marks on the resident's face looked like they were left by a shoe. Further, the fact that the incident involved Jonathan Martinez raised a significant concern of caretaker abuse.

65.     Brett Hemstreet told Plaintiff that he agreed with her that the injury looked like the mark was left by a shoe. Nevertheless, he told Plaintiff that they wouldn't reopen the investigation unless Akil Gay wanted to. Akil told Plaintiff that he knows the resident didn't fall in the shower, but the investigation was closed, and he wasn't going to reopen it.

66.     Therefore, Plaintiff took it upon herself to turn in the pictures of these injuries directly to the state authorities.

67.     As part of the investigation by the state advocate, Plaintiff learned that Liberty had waited a month to turn in the report to the state. Liberty did not send pictures of the initial injury, but waited until it healed and sent a picture of the injury after it was 30 days old.

68.     In April and May of 2023, Plaintiff reported to her manager Akil Gay on several occasions that she kept finding a resident, a non-verbal male, laying in his bed soaked in his own urine. Plaintiff noticed that the HS caretakers were on their phones, ignoring this resident. Plaintiff

also let Mr. Gay know that when she confronted the caretakers that were responsible for this resident, they ignored and laughed at her.

69.     One day after she reported this to Mr. Gay, a co-worker named Arianna Shannon came into Plaintiff's office and confronted her. Ms. Shannon yelled at Plaintiff that she needed to stop turning her in for things and to come talk to her first. Ms. Shannon continued to yell at Plaintiff in front of other staff and residents. Plaintiff sent an email to her manager Mr. Gay reporting this harassment and retaliation.

70.     In late April, Plaintiff attended the monthly HS3 meeting to talk about the residents' progress. Plaintiff specifically asked her manager to address the problem of false documentation related to completing the programs she had designed for the residents as discussed above. She also specifically raised the fact that she kept finding a certain resident soaked in his own urine. During the meeting, several co-workers, including an HS3 named John Roberts, berated and attacked Plaintiff, telling her that staff intentionally neglect and abuse residents because they don't like Plaintiff. Mr. Roberts told Plaintiff, "no one helps your clients because no one likes you." This was all in front of Akil Gay, the unit manager. Mr. Gay did nothing to stop the verbal attacks. Plaintiff eventually left the room in tears. The next day multiple staff members came up to Plaintiff telling her, "I heard you got your ass handed to you yesterday!" Staff continued to mock and intimidate Plaintiff.

71.     Plaintiff reported these incidents of harassment, intimidation, and retaliation to the HR department, including the HR Director Stacie Caywood.

72.     In May, Plaintiff discovered one of the residents had a gash on his right eye. Staff John Roberts and Ted Ford told Plaintiff that the resident, a non-verbal male, had used his left hand to punch himself in the right eye. Plaintiff believed this resident to be right-handed.

73.     Given Plaintiff's experience, Plaintiff did not believe the story about how this resident suffered an injury to his eye. Plaintiff conferred with the state advocate and decided to turn the injury into the state for investigation.

74.     On May 3, 2023, Akil Gay asked at least six employees, including Plaintiff, to provide a statement "addressing any known knowledge or informed knowledge of client abuse, neglect, or mistreatment." Plaintiff complied and provided Mr. Gay with a multiple page written statement.

75.     In or around May 2023, rather than termination, Liberty decided to move Jonathan Martinez from the East building to the West building. The staff on East building blamed Plaintiff for Jonathan's reassignment and called her a snitch and told other co-workers that she couldn't be trusted because she was a snitch.

76.     On or around June 1, 2023, Plaintiff reported to Mr. Gay that she again found the same resident discussed above laying in his bed soaked in his own urine.

77.     Just a few days later, in early June 2023, Plaintiff was contacted by law enforcement alerting her to the fact that there were flyers hung around Enid, Oklahoma with her picture and phone number, advertising her for sex work.

78.     As discussed above, this was extremely traumatic for Plaintiff as she was already experiencing severe emotional distress, including anxiety and depression, due to Defendants' conduct.

79.     Two days later, Plaintiff separately met with her manager, Akil Gay, and her human resources director, Stacie Caywood. Plaintiff begged both of them to do something to make the constant bullying and harassment stop. As described herein, Plaintiff had repeatedly reported acts of abuse, neglect, harassment, and retaliation for months to both of them. Nevertheless, neither

Mr. Gay nor Ms. Caywood did anything to help Plaintiff. They told her, "This is not a Liberty issue" because it happened off-campus.

80.    Plaintiff specifically told Akil Gay, "I can't work, I am so sick. I get called names here. And now this. People are wanting sexual favors from me.'" Plaintiff added, "it's all because I report stuff, that is why they don't like me. It's because I report things that are being done wrong to the clients. They retaliate." As described herein, this is not the first time Plaintiff reported this to Mr. Gay.

81.    Plaintiff was crying to Mr. Gay out loud in his office. This was how the meeting ended:

**Plaintiff:**  "I don't know how I am supposed to work."

**Akil Gay:**  "You have to learn how to control your emotion. You have to get your emotions under control."

**Plaintiff:**  "I have people with my photo and my number, calling me late at night wanting me to suck their popsicle."

**Akil Gay:**  "I understand that. I'm not saying its ok. Don't have an overreaction to it. It's not like they are popping up at your door or something. You have to learn how to control yourself. People do stupid things."

        . . .

**Plaintiff:**  "I cannot work, Akil."

**Akil Gay:**  "I'm not sure what you mean by that."

**Plaintiff:**  "I don't know how I'm gonna...like right now, I'm so sick to my stomach. Everything that has gone on."

82.    Immediately after that meeting, Plaintiff suffered a panic attack and was unable to breathe. She went to her doctor and was prescribed additional medication for her anxiety and depression. Plaintiff was placed on medical leave.

83.     Mr. Gay, and everyone else at Liberty, repeatedly responded to Plaintiff's complaints in a similar manner. They ignored, denied, and minimized her complaints and then ultimately blamed her.

84.     On June 15, 2023, law enforcement helped identify the Liberty employees that hung the flyers. Plaintiff immediately sent an email to Stacie Caywood at HR and Akil Gay regarding the flyers. Plaintiff also sent an email to Rosie, the assistant to Defendant Hugh Sage.

85.     On June 15, 2023, Plaintiff sent an email to Stacie Caywood desribing her history prior complaints about her co-workers. Plaintiff explained that management did not take her reports seriously and that it had only gotten worse. Plaintiff expressed to Ms. Caywood that Liberty had failed to protect her and keep her safe.

86.     On June 16, 2023, the Tulsa HR office of Liberty called and told Plaintiff that an investigation was being initiated into the employees that hung the flyers. Plaintiff was told that staff may be disciplined, but not fired. Liberty asked if Plaintiff wanted to move to another building. Plaintiff declined. Plaintiff never returned to work.

87.     On July 5, 2023, Plaintiff was granted three protective orders against the employees that hung the flyers.

88.     On July 19, 2023, Stacie Caywood sent Plaintiff an "offer of reinstatement" to come back to work. Plaintiff declined.

89.     As a result of law enforcement's investigation into the retaliation against Plaintiff, Plaintiff was told she was not safe living in Enid, Oklahoma and that it was in her best interest to move.

90.     In late July 2023, Plaintiff relocated. She was forced to give up custody of her children so as not to put them at risk of being a harmed by the constant attacks on Plaintiff.

91.     On November 14, 2023, 21-year-old Jonathan Martinez and 24-year-old John Alan Nieto were arrested on felony charges of abuse by caretaker and conspiracy. Nieto was also arrested on complaints of resisting arrest and obstruction. There was also a warrant issued for the arrest of 28-year-old Jonathan Colon Orozco on charges of abuse by caretaker and conspiracy. Police believe Orozco left the state to avoid being arrested.

92.     On November 20, 2023, three more employees, Gavin Foster, Edward Webster and Adlai Flores were charged with felonies for abusing patients at the Greer Center.

93.     In December 2023, Adrian Anderson Cottner and Carlos Ponce were charged with felonies for abusing patients at the Greer Center.

94.     In response to the arrests, a former Liberty employee that worked at the Greer Center posted the following message on social media:

> This just breaks my heart! I'm going to go off for just one post because I'm beyond bothered by this. First of all, this has been a LONG time coming. I worked here from April of 2017 to December of 2019, and it was honestly filled with a lot of trauma. I was actually in a position that conducted investigations on client abuse, so knowing the policies and procedures put in place to prevent this makes my heart sink to my stomach because it's obvious how many people were overlooking the abuse. The fact that Liberty is claiming in their statement this abuse has never happened before is just crazy because you can Google prior incidents of abuse, and if you go further into OSCN you can find nothing really came out of the charges as far as consequences go. With that being said, I pray so hard for an outcome that protects this population rather than everyone who is too coward to speak up .. Its actually crazy because even in my time at this place I was harassed for reporting abuse .. At one point I even reported my own boss for not reporting an incident and they asked if I wanted to move to another building in a demoted position, but i refused before I eventually decided to quit. Also, I am 110 lbs soaking wet and never had to resort to raising a hand to any of the clients to protect myself. If you do not thoroughly enjoy working with this population then move on! Do not let them use the fact that this population is aggressive as an excuse because that's just BS!

## VI.    CAUSES OF ACTION

### A. Intentional Infliction of Emotional Distress – Defendants Liberty of Oklahoma Corporation, Liberty Healthcare, Hugh Sage, Akil Gay, and Stacie Caywood

95.     Plaintiffs restate and adopt by reference their previous allegations herein.

96.     The actions by Defendants, including Liberty employees, constitutes an intentional infliction of emotional distress.

97.     The Liberty Defendants are vicariously liable for the actions of their employees acting in the scope of their employment.

98.     Defendants Hugh Sage, Akil Gay, and Stacie Caywood were acting within the scope of their employment in receiving and responding to Plaintiff's reports of abuse, neglect, harassment, and retaliation.

99.     Defendants knew that Plaintiff was being subjected to constant ridicule, abuse, harassment, and retaliation by her co-workers. Defendants knew that Plaintiff was not safe.

100.    In certain instances, Defendant Gay watched silently as Liberty employees verbally attacked Plaintiff.

101.    Defendants knew that Plaintiff was having panic attacks brought on by the anxiety and depression she was suffering as a result of the way she was being treated by her co-workers.

102.    Defendants knew that Plaintiff had to be treated with medication for severe emotional distress just so that she could return to work and endure the conditions at the Greer Center.

103.    Plaintiff begged Defendants, including her manager Defendant Akil Gay and Stacie Caywood, to put a stop to the ridicule, abuse, harassment, and retaliation by her co-workers.

104.    Defendants did nothing. To the contrary, Defendant Gay blamed Plaintiff for causing the retaliation, abuse, harassment and ridicule.

105.    Defendant Caywood likewise intentionally ignored Plaintiff's reports and refused to take appropriate actions in response to Plaintiff's reports, intentionally subjecting Plaintiff to additional harassment and retaliation.

106.    The events surrounding Plaintiff's employment were so extreme and outrageous as to go beyond all possible bounds of decency and would be considered atrocious and utterly intolerable in a civilized society, and caused severe pain, suffering and emotional distress to Plaintiff beyond that which a reasonable person could be expected to endure.

107.    As a result of the intentional infliction of pain, suffering and emotional distress, Plaintiff is entitled to actual and compensatory damages from Defendants.

108.    As a result of these intentional and abusive acts towards Plaintiff, Plaintiff is also entitled to punitive damages against Defendants.

**B.    Intentional Infliction of Emotional Distress – Defendants Aerin Merrick, Kena Bruno, Tayler Howard, Jennifer Bicknell**

109.    Plaintiffs restate and adopt by reference their previous allegations herein.

110.    The actions by Defendants, constitutes an intentional infliction of emotional distress.

111.    The actions and events surrounding Defendants' hanging flyers as described herein were so extreme and outrageous as to go beyond all possible bounds of decency and would be considered atrocious and utterly intolerable in a civilized society, and caused severe pain, suffering and emotional distress to Plaintiff beyond that which a reasonable person could be expected to endure.

112.    As a result of the intentional infliction of pain, suffering and emotional distress, Plaintiff is entitled to actual and compensatory damages from Defendants.

113.     As a result of these intentional and abusive acts towards Plaintiff, Plaintiff is also entitled to punitive damages against Defendants.

C. **Negligent Hiring, Training, Supervision and Staffing by Defendants Liberty of Oklahoma Corporation, Liberty Healthcare, Hugh Sage, Akil Gay, and Stacie Caywood**

114.     Plaintiffs restate and adopt by reference their previous allegations herein.

115.     Defendants Liberty of Oklahoma Corporation, Liberty Healthcare, Hugh Sage, Akil Gay, and Stacie Caywood were negligent in the staffing of the Greer Center, and in the hiring, training, and supervision of the agents, employees, and servants of the Greer Center.

116.     Defendants and their agents' and employees' breaches of the duty of care include, among other things:

   a.  Failing to properly supervise the Greer Center and Greer Center staff;

   b.  Failing to properly investigate reports of misconduct and abuse;

   c.  Failing to conduct appropriate assessments of Greer Center residents and employees;

   d.  Failing to report neglect, abuse, and misconduct as required by law;

   e.  Failing to have proper policies and procedures in place to prevent neglect and abuse inside the Greer Center;

   f.  Failing to have proper controls and checks in place to prevent employees from abusing residents;

   g.  Failing to take precautions to prevent Jane Doe from further injury;

   h.  Failing to adequately staff the Greer Center with sufficient and qualified personnel to provide the level of care and treatment needed by residents;

   i.  Failing to hire sufficient and qualified personnel to supervise and monitor the staff at the Greer Center;

   j.  Failing to properly train the Greer Center employees on abuse prevention and reporting;

   k.  Failing to do a proper and thorough background check before hiring employees;

l.   Retaining problematic employees, including those that abused or neglected patients and/or those that provided false documentation;

m.   violating the Oklahoma Nursing Home Care Act as described herein, constituting negligence *per se*;

n.   violating the Oklahoma Protective Services for Vulnerable Adults Act as described herein, constituting negligence *per se*;

o.   violating other Oklahoma laws and statutes applicable to the Greer Center Facility, constituting negligence *per se*;

p.   Failing to train employees how to properly handle reports of retaliation and harassment; and

q.   Failing to protect Plaintiff from abuse, harassment, and retaliation.

117.   As a result of this negligence, Plaintiff suffered physical and mental pain and injuries, for all of which Plaintiffs are entitled to actual and compensatory damages, and punitive damages.

### D. **Gross Negligence by Defendants Liberty of Oklahoma Corporation, Liberty Healthcare, Hugh Sage, Akil Gay, and Stacie Caywood**

118.   Defendants' breach of duty in properly staffing the Greer Center, and in the hiring, training, and supervision of the agents, employees, and servants of the Greer Center described above was intentional or with malice, in reckless disregard for the rights of others, or grossly negligent.

119.   As a result of this gross negligence, Plaintiff suffered physical and mental pain and injuries, for all of which Plaintiffs are entitled to actual and compensatory damages, and punitive damages.

### E. **Violation Of The Protective Services For Vulnerable Adults Act (43a O.S. §§ 10-101 Et Seq.) (All Defendants)**

120.   Plaintiff re-alleges and incorporates by reference all the foregoing allegations as if fully set forth herein.

121.    The Liberty Defendants, and their agents, employees, or servants, including the Greer Center Administrators and Individual Defendants, have responsibility for providing the Relevant Services to Greer Center residents.

122.    The residents of the Greer Center are vulnerable adults as defined by the Protective Services for Vulnerable Adults Act in 43A O.S. § 10-103.

123.    The Liberty Defendants, and their agents, employees, or servants, including the Greer Center Administrators and Individual Defendants, are caretakers as defined in 43A O.S. § 10-103.

124.    The Liberty Defendants, and their agents, employees, or servants, including the Greer Center Administrators and Individual Defendants, have a duty to report abuse, neglect, or exploitation of vulnerable adults at the Greer Center.  43A O.S. § 10-104.

125.    The Liberty Defendants, and their agents, employees, or servants, including the Greer Center Administrators and Individual Defendants, violated the Oklahoma Protective Services for Vulnerable Adults Act (43A O.S. §§10-101, et seq.) by failing to report abuse, neglect, and exploitation of residents of the Greer Center.

126.    The Liberty Defendants, and their agents, employees, or servants, including the Greer Center Administrators and Individual Defendants, violated the Oklahoma Protective Services for Vulnerable Adults Act (43A O.S. §§10-101, et seq.) by bullying and harassing Plaintiff, impairing and/or preventing her from doing her job, and for ultimately causing her to quit her job, for making reports of abuse and neglect of Greer Center residents.

127.    Further, the Liberty Defendants, and their agents, employees, or servants, including the Greer Center Administrators and Individual Defendants, willfully and recklessly concealed,

24

manipulated, and/or ignored Plaintiff's reports and hid the truth about the health and safety of the residents of the Greer Center.

128.    As a result of the violations of the Oklahoma Protective Services for Vulnerable Adults Act by all Defendants, Plaintiff suffered serious injuries and physical and emotional pain and distress, for all of which Plaintiff is entitled to actual and punitive damages in addition to attorneys' fees.

**F.  Violation Of The Nursing Home Care Act   (63 O.S. §§ 1-1901 Et Seq.) (All Defendants)**

129.    Plaintiff re-alleges and incorporates by reference all the foregoing allegations as if fully set forth herein.

130.    The Liberty Defendants, and their agents, employees, or servants, including the Greer Center Administrators and Individual Defendants, have responsibility for providing the Relevant Services to Greer Center residents.

131.    The Liberty Defendants, and their agents, employees, or servants, including the Greer Center Administrators and Individual Defendants, violated the Oklahoma Nursing Home Care Act (63 O.S. §§1-1901, et seq.), including but not limited to 63 O.S. §1-1918(B)(7),(10) (11) and (12), and 63 O.S. 2001, §1-1939, by failing to provide adequate and proper care and accommodations to Greer Center residents and by subjecting them to mental and physical abuse and neglect.

132.    The Liberty Defendants, and their agents, employees, or servants, including the Greer Center Administrators and Individual Defendants, violated the Oklahoma Nursing Home Care Act (63 O.S. §§1-1901, et seq.), by discharging, harassing, dismissing and or retaliating against Plaintiff for making a report of abuse, neglect, and other wrongdoing.

133.    Liberty Defendants are responsible for the intentional actions and omissions of their employees and agents, including all Individual Defendants (63 O.S. 2001, §1-1939(A)).

134.    As a result of the violations of the Nursing Home Care Act by all Defendants, Plaintiff suffered serious injuries and physical and emotional pain and distress, for which Plaintiff is entitled to actual and punitive damages and costs of suit.

### G. Civil Conspiracy - Defendants Liberty of Oklahoma Corporation, Liberty Healthcare, Hugh Sage, Akil Gay, and Stacie Caywood

135.    Plaintiffs restate and adopt by reference their previous allegations herein.

136.    Defendants Liberty of Oklahoma Corporation, Liberty Healthcare, Hugh Sage, Akil Gay, and Stacie Caywood conspired to overtly conceal the abuse and neglect being inflicted upon the residents of the Greer Center as well as the harassment and retaliation against Plaintiff.

137.    Defendants conspired to overtly lie or conceal the truth from the state, investigators, including the DHS's Office of Client Advocacy (OCA), as to the ongoing abuse, neglect, retaliation, and harassment inside the Greer Center.

138.    Defendants conspired to overtly retaliate, and ratify others retaliation, against other employees, including Plaintiff, for speaking out about the abuse and neglect inside the Greer Center.

139.    Defendants overtly misrepresented facts concerning the abuse, neglect, retaliation and harassment to the state and other investigators.

140.    Moreover, Defendants conspired to overtly violate Oklahoma law, including but not limited to the Oklahoma Nursing Home Care Act and/or the Oklahoma Protective Services for Vulnerable Adults Act, as described herein.

141.    As a result of the Defendants conspiracy, Plaintiff suffered serious injuries and physical and emotional pain and distress, for which Plaintiff is entitled to actual and punitive damages and costs of suit.

**H. Defamation – Defendants Aerin Merrick, Kena Bruno, Tayler Howard, and Jennifer Bicknell**

142.    Plaintiffs restate and adopt by reference their previous allegations herein.

143.    The actions by Defendants constitute defamation.

144.    Defendants posted statements in flyers around town using Plaintiff's name, advertising that Plaintiff was offering to engage in sex work. These statements were false. Defendants knew they were false.

145.    Defendants published these statements to the public with malice and knowledge of their falsity.

146.    Defendants' published statements were false and malicious and exposed Plaintiff to public embarrassment and/or ridicule and deprived Plaintiff of public confidence, and injured her reputation at work and ability to work.

147.    Defendants' published statements were libelous *per se* because they were susceptible of but one derogatory meaning, that Plaintiff was offering to perform sexual acts to strangers, and the publication on its face shows that the derogatory statements, taken as a whole, refer to the Plaintiff.

148.    These statements and flyers cause Plaintiff significant damage, including severe emotional distress.

149.    As a result of this defamation, Plaintiff suffered mental pain and suffering, for all of which Plaintiffs are entitled to actual and compensatory damages, and punitive damages.

**I.** **Invasion of Privacy - False Light – Defendants Aerin Merrick, Kena Bruno, Tayler Howard, and Jennifer Bicknell**

150.    Plaintiffs restate and adopt by reference their previous allegations herein.

151.    The actions by Defendants, constitutes Invasion of Privacy - False Light.

152.    Defendants placed Plaintiff in the public in a false light by hanging flyers around town advertising sex work.

153.    Defendants' actions were malicious and would be highly offensive to a reasonable person

154.    Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. Defendants knew that Plaintiff was not a prostitute and did not other advertise herself publicly as a sex worker. Defendants knew this was false and would place Plaintiff in a false light.

155.    As a result of this invasion of privacy, Plaintiff suffered mental pain and suffering, for all of which Plaintiffs are entitled to actual and compensatory damages, and punitive damages.

**VII.** **JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable.

**VIII.** **PRAYER FOR RELIEF**

WHEREFORE, premises considered, Plaintiff respectfully prays for judgment in her favor and against Defendants, jointly and severally, as follows:

a) Actual, Compensatory and Punitive Damages;

b) Attorney's Fees and Cost of Litigation; and

c) Any other relief to which Plaintiff is entitled.

Respectfully Submitted,


/s/ *Brad E. Beckworth*
Bradley E. Beckworth, OBA No. 19982
Ross Leonoudakis, OBA No.
Nathan B. Hall, OBA No. 32790
**NIX PATTERSON, LLP**
8701 BEE CAVE ROAD
BUILDING 1, SUITE 500
AUSTIN, TEXAS 78746
Telephone: (512) 328-5333
Facsimile: (512) 328-5335
*bbeckworth@nixlaw.com*
*tduck@nixlaw.com*
*rossl@nixlaw.com*
*nhall@nixlaw.com*

*-and-*

Cameron Spradling, OBA No. 8509
**CAMERON SPRADLING, PLLC**
500 North Walker Avenue, Suite 100
Oklahoma City, Oklahoma 73102
Telephone: (405) 605-0610
Facsimile: (405) 605-0615
*cameron@cameronspradling.com*

**Attorneys for Plaintiff**

**JURY TRIAL DEMANDED**